CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
April 15, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Nicholas Wray, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:23-cv-00060 |
| | ) | |
| Life Insurance Company of North America | ) | |
| | ) | |
| and | ) | |
| | ) | |
| The West Monroe Partners, Inc. Welfare Plan, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Life Insurance Company of North America's ("LINA") motion "(1) For Summary Judgment, or, in the Alternative, (2) For Remand, or, Further in the Alternative, (3) For Judgment on the Administrative Record," (Dkt. 43), Defendant The West Monroe Partners, Inc. Welfare Plan's ("WMP") motion for summary judgment, (Dkt. 47), and Plaintiff Nicholas Wray's motion for judgment on the administrative record, (Dkt. 45). The motions are fully briefed and ripe for review. For the reasons stated below, the court will grant LINA and WMP's motions for summary judgment and deny Wray's motion for judgment on the administrative record.

# I.    Background

## A. Factual History

Wray brought this action against Defendants LINA and WMP pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq*. ("ERISA"). (Am. Compl. ¶ 1.) The following facts are taken from the administrative record and are undisputed, unless otherwise noted.

### 1.  Medical Background

Wray suffers from Granulomatosis with Polyangiitis ("GPA"), a form of necrotizing vasculitis which causes inflammation in the small blood vessels and capillaries. (Administrative Record at 155–57, 1067 [hereinafter "AR"];[1] Mem. of L. in Supp. of Pl.'s Mot. for J. on the Admin. R. at 1–2, 8 (Dkt. 46) [hereinafter "Wray Mem."].) Wray first contracted vasculitis in January 2020. (AR 140–43, 268; Resp. in Opp'n to Defs.' Mots. for Summ. J. at 5 (Dkt. 53) [hereinafter "Wray Resp."].) Two months later, Wray was admitted to Loudon Hospital for "stroke like symptoms," although Wray's MRI and MRA scans returned normal. (AR 140, 268, 582.) In July 2020, Wray's rheumatologist diagnosed him with vasculitis. (*Id.* at 140.) Wray claims his GPA has resulted in hearing issues, migraines, scleritis, double vision, and neurological deficits. (Wray Mem. at 8 (citing AR 156–57).)

---

[1] The administrative record filed with the court is bates-numbered LINA000001–001368. Though the court will refer to the pages as they are numbered, it will drop "LINA" and any leading zeroes in its citations.

2.  Wray's Employment

Wray is a former employee of West Monroe Partners, Inc. ("West Monroe").  (Wray Mem. at 1.)  On November 1, 2020, Wray began work as a Senior Manager with West Monroe, a management and technology consulting firm which had acquired his previous employer. (AR 952, 1136; Mem. of Def. WMP in Supp. of Mot. for Summ. J. at 4 (Dkt. 48) [hereinafter "WMP Mem"]; Wray Resp. at 5.)   As a Senior Manager, Wray was responsible for leading small teams of consultants, developing "quantitative analyses" and supervising the quality of analyses performed by other members of his team, overseeing "complex programs and project teams on IT strategy, process optimization, or sourcing initiatives," managing the development of financial models, storyboards, and work, migration, and contingency plans, and other high-level management tasks.  (AR 1040–42.)  Wray worked 40-hour weeks in this salaried position.  (*Id.* at 952.)

3.  STD Plan and LTD Policy

Through his employment with West Monroe, Wray obtained insurance coverage under both a short-term disability income plan ("STD Plan") and a long-term disability policy ("LTD Policy").[2]  Both are the subject of this litigation.

---

[2] Wray disputes that the STD coverage and LTD coverage "fall under a different 'Plan.'"  (Wray Resp. at 4–5.)  Instead, he argues that they both fall under the "West Monroe Partners, LLC Welfare Benefit Plan," through which West Monroe provides short-term and long-term disability benefits to its employees, some of which are administered by LINA.  (*Id.*)

On review, it does not appear that this fact is actually disputed.  LINA acknowledges that the West Monroe Partners, LLC Welfare Benefit Plan contains both a "Short Term Disability Income Plan" and a group LTD insurance policy.  (Mem. of Def. LINA in Supp. of Mot. for Summ. J., Mot. for Remand, Mot. for J. on the Admin. R. at 3 (Dkt. 44) [hereinafter

i.   *STD Plan Provisions*

The STD Plan provides coverage for disability "if, solely because of covered Injury or Sickness," an employee is "unable to perform all of the material duties of his or her Regular Job" and "unable to earn 80% or more of his or her Covered Earnings from working in his or her Regular Job." (*Id.* at 19.)  To evaluate whether an employee's injury or illness meets this standard, "the Insurance Company will consider the duties of the job as it is normally performed for the Employer." (*Id.* at 30.)  An employee who successfully claims a disability may receive 100% of his weekly Covered Earnings for up to 13 weeks. (*Id.* at 19–20.)

The STD Plan is self-insured by West Monroe, meaning that the company pays all benefits owed under the STD Plan. (*Id.* at 5–6; Mem. of Def. WMP in Opp'n to Pl.'s Mot. for J. on the Admin. R. at 1 (Dkt. 54) [hereinafter "WMP Resp."].)  Though West Monroe serves as the Plan Administrator, the Plan delegates to LINA the discretionary authority to decide all benefits claims and appeals. (*See* AR 70, 1321.)

ii.   *LTD Policy Provisions*

The LTD Policy provides coverage for disability "if, solely because of Injury or Sickness," an employee is "(1) unable to perform the material duties of his or her Regular

---

"LINA Mem."] (citing AR 53, 1325).)  So too does WMP recognize that the STD Plan is included in an overarching employee welfare benefit plan sponsored by West Monroe.  (WMP Mem. at 3.)

Reading between the lines, Wray seems to take issue with the classification of the STD claim as arising under an STD "plan" rather than "policy."  Because the distinction as the court understands it would not change the analysis or outcome of the discussion below, and because the documentation in the record refers to a "Short Term Disability Income Plan," (AR 53), and a long-term disability "Policy," (*id.* at 1325), the court will use that terminology throughout.

Occupation; and (2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation."  (*Id.* at 1328, 1331, 1334, 1337.)[3]  "Regular Occupation" is "[t]he occupation the Employee routinely performs at the time the Disability begins."  (*Id.* at 1354.)  "In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy." (*Id.*)  Unlike a "regular job," a regular occupation "is not work tasks that are performed for a specific employer or at a specific location."  (*Id.*)  After 24 months, an employee must demonstrate that he or she is "unable to perform the material duties of *any occupation* for which he or she is, or may reasonably become, qualified based on education, training, or experience," and that he or she is "unable to earn 60% or more of his or her Indexed Earnings" in order to qualify as disabled.  (*Id.* at 1328 (emphasis added); *see also id.* at 1331, 1334, 1337.)

Though this plan was provided to Wray through his employment with West Monroe, LINA is responsible for making all claims determinations and paying all benefits under the LTD Policy.  (LINA Mem. at 3 (citing AR 1321).)

4.  Initial STD Claim

On November 17, 2022, Wray visited Dr. Jennifer Odutola, his rheumatologist.  (*See* AR 1089.)  His doctor recorded the "[n]otable point[]" from that visit being that Wray reported

---

[3]  The court notes that, since the disability provision is the same regardless of employee classification, (*see* AR 1327), it does not decide the issue of Wray's classification.

contracting COVID in late September or early October. (*Id.*) There were no other notes regarding Wray's cognitive abilities or symptoms reported from that visit. (*Id.*)

On Wednesday, November 30, 2022, Wray worked a full eight-hour day at West Monroe. (*Id.* at 952.) The next day, Wray did not report for work. (*Id.*) He did not return to work thereafter. (*Id.*) On December 15, 2022, West Monroe laid off 7% of its workforce, including Wray. (*Id.* at 140; WMP Mem. at 5.)

Wray filed a claim for STD benefits on December 2, 2022, two days after he stopped reporting for work at West Monroe. (AR 401.) After filing his claim, Wray visited Dr. Odutola again on December 13 for a "follow up visit" regarding his chronic eye and ear issues. (*Id.* at 1089.) During that visit, Wray reported "difficulty at work" attributable to difficulty hearing, fatigue, "[v]ery poor memory recall," "HAs," mood changes, and issues with attention. (*Id.* at 1090.) The latter two symptoms were attributed to his dose of Prednisone. (*Id.*) Dr. Odutola's physical exam revealed findings of "abnormal" recent and remote memory, as well as "evidence of psychosocial dysfunction." (*Id.* at 1091, 1093.) At the conclusion of the visit, Dr. Odutola "advised [Wray] to proceed with short term disability." (*Id.* at 1092 ("For now I consider [him] to be effectively disabled.").)

In support of Wray's STD claim, Dr. Odutola completed a "Medical Request Form" on December 20. (*Id.* at 1083.) In the form, she attested to Wray's inability to work due to a "[h]earing impairment and cognitive impairment" which rendered Wray "incapable of analyzing large volumes of data." (*Id.*) Wray submitted this form to LINA along with Dr.

Odutola's notes from his December 13 visit in support of his STD claim.  (*See id.* at 1094[4];
1031.)  On December 27, a nurse case manager at LINA wrote to Dr. Odutola with eight
questions about the two documents, including "[w]hat are the specific restrictions . . . imposed
on your patient past 12/1/22 (per 12/20/22 medical request form, you had indicated
incapacitated, unable to work—please be specific)?" and whether Wray could return to work
if accommodations were provided.  (*Id.* at 1094–95.)  In response, Dr. Odutola submitted a
letter dated January 9, 2023, that "attempt[ed] to address the issues brought up" in the
December 27 letter.  (*Id.* at 1097–98.)  The letter reiterated that Wray was "incapacitated due
to deficits in cognitive function, mood lability and hearing," but that he was "not incapacitated
due to musculoskeletal dysfunction."    (*Id.* at 1097.)    Dr. Odutola reported that
"[a]ccommodations—will not be helpful in this situation—due to his cognitive deficits and
hearing deficits."  (*Id.*)

5.  Initial STD Denial

Following its review of the submitted documentation, LINA denied Wray's STD claim
on January 11, 2023.  (*Id.* at 1031.)  It based its denial on the December 13 office visit note,
the December 20 Medical Request Form, and the January 9 letter from Dr. Odutola.  (*Id.*)  The
letter noted that "[w]hile it is documented that you were treating, we were not provided with
clinical documentation or office notes with exam findings that detailed a severity, frequency,

---

[4] Though it appears LINA confused the dates of the office visit and the "Medical Request Form," it is clear the LINA
reviewer had both materials before her.

- 7 -

and/or duration of symptoms to support continued disability." (*Id.* at 1032.) As a result, LINA found "an explanation of [Wray's] functionality and how [his] functional capacity prevented [him] from performing [his] occupation was not clinically supported." (*Id.*) Wray appealed the STD denial on January 17, 2023. (*Id.* at 1125.)

### 6. First Supplement to Medical Records

Wray next visited Nurse Practitioner Melissa Ochoa at Neurologic Associates, PLC, on January 18, 2023. (*Id.* at 582–84.) Wray reported that nine months previously, he had "started noticing changes in his short term memory, difficulty with information processing, attention and concentration." (*Id.* at 582.) He also reported the recent death of his ex-wife. (*Id.* at 584.) Ochoa performed a physical exam, where Wray appeared "alert and oriented to person, place and time." (*Id.* at 583.) Wray was "[a]ppropriate in conversation and cooperative" and his "[h]earing [was] intact to finger rub." (*Id.*) Ochoa also performed a Mini-Mental State Examination ("MMSE"), which resulted in a score of 28/30, though Ochoa noted that Wray was "repetitive with questions," "needs to write everything down," and was "slightly anxious." (*Id.* (emphasis omitted).) At the conclusion of the visit, Ochoa ordered brain MRI and head MRA scans and referred Wray to Dr. John Lewis for formal neuropsychological testing. (*Id.* at 584.) She also noted her suspicion that Wray has a mild cognitive impairment. (*Id.*)

On February 6, 2023, Wray obtained another brain MRI for a history of "MCI (mild cognitive impairment) with memory." (*Id.* at 605–06.) The reading physician found "[n]o specific structural etiology for [Wray's] symptoms" based on the scan. (*Id.* at 606.) On February 11, Wray also received a "normal" MRA scan of his head. (*Id.* at 608–09.) Wray

contends that he "expected [the tests] to be clear as previous testing in 2020 had not identified aneurysms" and Ochoa had "indicated [his] symptoms [were] more likely side effects of drugs." (*Id.* at 595.) LINA, however, argues that Ochoa would not have ordered the tests had she expected no change and that the results "are indeed probative of no cognitive impairment." (Opp'n of Def. LINA to Pl.'s Mot. for J. on the Admin. R. at 6 (Dkt. 52) [hereinafter "LINA Resp."].)

7.  LINA's Review of First Supplement to Medical Records

Two days after his MRA scan, Wray emailed LINA "some updated information," including an annotated copy of his job description, a "brief synopsis of [his] condition, treatment, and symptoms," notes from his January 18 visit with Ochoa, and the results of his most recent MRI and MRA scans. (AR 593–95.) The synopsis included a detailed narrative of Wray's diagnosis and medication regimen, as well as symptoms relevant to his STD claim. (*Id.*) He also emailed LINA notes from visits with Dr. Elizabeth Fox, an otolaryngologist, and copies of hearing tests from November 2020 to July 2022. (*Id.* at 610–11.)

In March 2023, LINA asked three different doctors to review Wray's medical records—a rheumatologist, (*id.* at 1110–12), a neurologist, (*id.* at 1117–21), and a behavioral health specialist, (*id.* at 718–20). These records included the visit notes from Ochoa and Dr. Odutola and Wray's most recent scans. All three reviewing doctors independently concluded that Wray's medical records did not support a finding of functional limitations. (*Id.* at 720, 1112, 1120.)

On March 1, Dr. Penny Chong, the reviewing rheumatologist, concluded that Dr. Odutola's "opinion [was] not well supported by medically acceptable clinical or laboratory diagnostic techniques and [was] inconsistent with the other substantial evidence in the claim file." (*Id.* at 1111.) Dr. Chong cited Wray's MMSE score, a lack of information about Dr. Odutola's reasoning, Wray's ability to handle his own finances and medications, and his normal MRI and MRA scans in drawing this conclusion. (*Id.* at 1111–12.) Dr. Chong reached out to Dr. Odutola in her assessment of Wray's condition but did not receive a response. (*Id.* at 1110.)

On March 7, Dr. Sanjay Jain, the reviewing neurologist, reported that he disagreed with Dr. Odutola's opinion. (*Id.* at 1120.) Dr. Jain identified GPA as a co-limiting condition, but "defer[red] opinion to [the] appropriate specialty." (*Id.* at 1119.) Instead, Dr. Jain focused on Wray's neurologic complaints and hearing loss, citing Wray's MMSE, neuroimaging, and other evidence of his ability to carry out basic activities of daily living. (*Id.* at 1119–20.) Dr. Jain concluded that "[e]ssentially, documentation does not provide evidence of any continuous impairments resulting in limitations or presence of any conditions that would require restrictions from work." (*Id.* at 1120.) He did, however, explicitly acknowledge that he did not comment on "non-neurologic conditions" and that "[a]ny assessment concerning any psychiatric/psychological conditions [was] deferred to the appropriate BHS/behavioral health specialist." (*Id.*)

Following the submission of this report, Dr. Jain documented four additional interactions with Wray's providers. On March 7, Dr. Jain called the office of Neurologic

- 10 -

Associates and asked to speak with Ochoa, but she was unavailable.  (*Id.* at 710.)  Dr. Jain

followed up again the next day.  (*Id.*)  Two and a half hours later, Dr. Jain received a call back

from a nurse at Neurologic Associates, who indicated that Ochoa had spoken with her and

conveyed that she was "not recommending any restrictions for the customer and she has not

identified any limitations either."  (*Id.* at 711.)[5]  Dr. Jain asked for the nurse to fax notes from

Wray's last visit and received that fax approximately ten minutes later.  (*Id.*)  Dr. Jain included

these interactions as addenda to his original review.  (*See id.* at 708.)

Finally, on March 13, Dr. Marian Rosado, the reviewing psychologist, concluded that

she "disagree[d] with the treating provider" as to Wray's limitations.  (*Id.* at 718–19.)  Dr.

Rosado reported that she was referred the case "for clarification of functional limitations and

restrictions of 'no work' related to psychiatric diagnoses as captured in the MR (anxiety,

ADHD)."  (*Id.* at 718.)  In her review, Dr. Rosado examined treatment records which revealed

a positive ADHD screening questionnaire, anxiety as a past medical condition, and self-reports

of a "slightly anxious" mood.  (*Id.*)  Dr. Rosado found the medical record "supports that

[Wray's] reported psychiatric symptoms [were] inconsistent with the course and nature of a

severe psychiatric dysfunction and global functional impairment consistent with ADA

---

[5] Wray argues that Dr. Jain "either misunderstood or incorrectly recorded" his conversation with Ochoa's nurse.  (Wray
Mem. at 13.)  He references a June 15, 2023 letter from Ochoa clarifying that, although she did report that Wray "does
not have any restrictions per say [sic] to his activity," she did suspect he suffered from cognitive impairment.  (AR 218.)
Ochoa emphasized that her "statement that [Wray] did not have any activity restrictions in no way meant that he had
capacity to work or maintain employment and further testing was required to make a formal diagnosis."  (*Id.*)  Although
Ochoa may not have affirmatively asserted that Wray could perform work, she does not deny making the statement
recorded in Dr. Jain's addendum to his March 7 report, nor does that statement appear inconsistent with her statements
in the June 15 letter.

guidelines." (*Id.* at 719.)  Specifically, Wray's anxiety and ADHD were "inconsistent with severe psychiatric, cognitive/medical dysfunction impairing [Wray's] functional status globally." (*Id.*)  Dr. Rosado also emphasized that "avoiding work due to psychiatric symptoms" or fear of exacerbation of those symptoms was insufficient to support activity restrictions. (*Id.*)  She concluded that "it is expected that [Wray's] self-reported/self-appraised psychiatric symptoms remain at baseline, or better, if in the future he is recommended evidenced treatments which are typically completed at outpatient basis and after work hours." (*Id.*)

The same day, LINA informed Wray that it intended to deny his appeal. (*Id.* at 650–55.)  LINA provided Wray two weeks—until March 27—"to respond to new evidence and/or new rationales [LINA] considered, relied on, or generated in reaching [its] appeal decision" before LINA issued a final determination. (*Id.* at 650, 654.)

8.  Second Supplement to Medical Records

Following LINA's letter, Wray visited Dr. Lewis for an "Initial Neuropsychological Evaluation" pursuant to his referral from Ochoa. (*Id.* at 140–41.)  During the visit, Wray reported forgetting conversations, "trouble keeping focused on a task over time," and "trouble finding his way around town," often relying on GPS "to go even short distances." (*Id.* at 141.)  He also reported a maximum of two hours of "[c]ognitive focus" per day. (*Id.*)  On the basis of these self-reported symptoms, Dr. Lewis diagnosed Wray with a mild cognitive impairment, unspecified mood disorder, and adjustment disorder with mixed features, noting that Wray's

vasculitis had "worsened over time to include both sensory and cognitive changes" and that high doses of steroids had "resulted in mood changes and irritability." (*Id.*)

On May 3, 2023, Wray again visited Dr. Lewis. (*Id.* at 142–43.) Wray informed Dr. Lewis that he had spoken with LINA and they "extended him by 2 weeks, so that this evaluation could be moved forward." (*Id.* at 142.) Dr. Lewis noted that LINA appeared to be "seeking more data" on Wray's functional impairments at work. (*Id.*)

Dr. Lewis conducted a five-hour "Neuropsychological Evaluation" ("NPE") of Wray on May 10 and 13. (*Id.* at 144–47.) Dr. Lewis found that Wray had a superior baseline intellect but that his "learning and memory functioning" showed "evidence of severe degradation from his probable baseline." (*Id.* at 144.) "Considered in isolation," Dr. Lewis concluded that "this level of memory deficit is disabling to [Wray] vocationally." (*Id.* at 145.) Specifically, Wray "would not be able to perform his previous work with this level of memory impairment." (*Id.*) At the conclusion of testing, Dr. Lewis found that Wray's language functioning and visuospatial functioning "remain[ed] at or near his probable baseline." (*Id.*) But Wray also demonstrated "consistent severe deficits in learning and memory" which were "disabling." (*Id.*) Dr. Lewis also observed that Wray's performances in "attention, concentration and executive functioning" were "inconsistent," but that tasks involving "even a modicum of memory go very poorly for him." (*Id.*) Dr. Lewis concluded that Wray "is clearly disabled from his previous work as a consultant," observing that "[t]here is no way that he could perform his previous duties with the existing memory and executive functioning impairments" he experienced. (*Id.*) He also noted that he believed Wray's condition was static, not

- 13 -

progressive, because neither Wray nor his wife reported progression and "[t]he trajectory of [Wray's] illness is clearly linked to the 2020 onset of Vasculitis and the subsequent arduous treatment course." (*Id.* at 146.) Dr. Lewis formally diagnosed Wray with amnestic disorder, atypical dementia, and adjustment disorder with mixed depression and anxiety. (*Id.*)

Dr. Lewis also reported on the validity of his testing. He observed that Wray "appeared to try his best" throughout testing and that "[t]here were no indications of symptom exaggeration or malingering during the evaluation." (*Id.* at 144.) Dr. Lewis noted that he incorporated "one test" into the evaluation to measure validity: the Test of Memory Malingering ("TOMM"). (*Id.*) Wray scored a 39/50 on Trial 1, 44/50 on Trial 2, and 45/50 on the Retention Trial. (*Id.* at 147.) Dr. Lewis reported that these results indicated valid performance on the NPE. (*Id.* at 144 ("Mr. Wray's performance was valid on this measure.").) Overall, Dr. Lewis concluded that he believed the evaluation "offer[ed] an accurate reflection of [Wray's] current neurocognitive functioning." (*Id.*)

The next month, Wray visited Dr. Mark Landrio, a neurologist at Neurologic Associates, to follow up on the diagnoses from Dr. Lewis. (*Id.* at 267–69.) At the visit, Wray reported "changes in his short term memory, difficulty with processing information, attention, and concentration" beginning in 2021. (*Id.* at 268.) He also reported he "ha[d] no changes in his ADLs with no difficulty managing his medications and finances." (*Id.*) Dr. Landrio recorded the results of Wray's MRI, MRA, and the NPE, but did not discuss the diagnoses ultimately made by Dr. Lewis. (*Id.*) Instead, the purpose of the visit appeared to be to set

follow-up appointments with Dr. Landrio and Ochoa and to address Wray's difficulties

sleeping. (*Id.*)

On July 5, 2023, Wray underwent additional evaluation by Joseph Atkinson, a

vocational rehabilitation consultant, for his STD claim. (*Id.* at 256–60.) Atkinson considered

the following documentation in his report:

- LINA's 1/11/23 letter denying Wray's STD claim;
- LINA's 3/13/23 letter advising Wray of its intent to uphold the denial of his STD claim;
- Dr. Odutola's 12/20/22 Medical Request Form;
- Dr. Odutola's 1/9/23 response to LINA's inquiry;
- Job description for Senior Manager position at WMP;
- Dr. Lewis' two-day neuropsychological evaluation of Wray;[6]
- Discussion with Wray; and
- Atkinson's own software and Dictionary of Occupational Titles ("DOT").

(*Id.* at 256, 259.) Atkinson determined that, based on Wray's reported job tasks, Wray's

position best fit the "Consultant" position in the DOT, which requires "general learning

ability, verbal aptitude, numerical aptitude, and spatial aptitude in the 'above average' range,

or at least the 67th percentile." (*Id.* at 259; *see id.* at 257–59.) He also identified LINA's

definition of disability as presented in its letters to Wray. (*Id.* at 258.)

Atkinson noted that Wray's STD claim was denied "based on the medical reviews of

various specialists working for the insurer" and that the "decision was made without the

_____

[6] Though Atkinson refers throughout to the 4/26/23 NPE completed by Dr. Lewis, the passages he quotes are from
Wray's May 10 and 13 evaluation. (*See id.* at 258–59 (citing a "neuropsychological evaluation of 4/26/2023" but quoting
from the later evaluation).) To avoid confusion, the court will use the correct date in its discussion.

benefit of a neuropsychological assessment to formally evaluate Mr. Wray's current cognitive ability." (*Id.* at 259.)  With that assessment now completed, Atkinson found Wray's "current level of function is well below the required aptitude level as indicated in the DOT" for his position. (*Id.*)  Atkinson concluded that "Wray is disabled for his job as well as his occupation in the general economy and is disabled according to the plan." (*Id.* at 260.)

On July 12, 2023, Wray through his counsel submitted to LINA a 115-page "Supplement to Appeal" letter. (*Id.* at 155–269.)  The letter argued that LINA's denial of Wray's STD claim was improper on several grounds:  (1) LINA's denial was not based on "substantial evidence"; (2) Wray provided evidence demonstrating he was disabled under the policy definition; (3) LINA improperly failed to consider the opinion of Wray's doctors; (4) LINA improperly disregarded Wray's self-reported symptoms; (5) LINA failed to consider evidence it knew or should have known about; (6) LINA did not consider Wray's medications as evidence; (7) LINA did not conduct a vocational review; (8) LINA did not provide the complete claim file to Wray and his counsel; and (9) LINA did not provide its internal rules and procedures to Wray and his counsel. (*Id.* at 171–82.)

The letter also offered additional evidence for LINA's review, including Wray's visits with Dr. Lewis and NPE results, (*id.* at 187–96); a report from internist Dr. Ashwini Vijayakumar, who reviewed Wray's records and reported Wray could not meet the cognitive demands of his job, (*id.* at 200–12); a June 15, 2023 letter from Ochoa clarifying that she did not know that Dr. Jain was referring to Wray's ability to work when she was quoted in his review, (*id.* at 218); Atkinson's vocational assessment, (*id.* at 256–60); Dr. Landrio's medical

- 16 -

records on Wray, (*id.* at 267–69); and various articles discussing vasculitis, GPA, and the effects of prednisone on cognitive functions, (*see id.* at 184).

The letter was introduced as "a supplement to Mr. Wray's STD appeal of [LINA's] letter dated January 11, 2023, and a response to the reports [LINA] provided him on March 13, 2023." (*Id.* at 155.) But the letter also included a brief portion addressing Wray's LTD claim. The first sentence of the letter informed LINA that Wray's counsel "continues to represent Nick Wray in his claim for Short-Term (STD) and Long-Term Disability (LTD) benefits under his group STD and LTD plan provided by his employer, West Monroe Partners Inc." (*Id.*) The next paragraph read:

> As an initial matter, to the extent [LINA] has not already opened an LTD claim for Mr. Wray, please let this letter serve as notice of his application for LTD benefits. For his LTD claim, we incorporate by reference all records from his STD file, including but not limited to the documents we are attaching with this appeal supplement. If [LINA] requires any forms or anything else to process his LTD application, please let us know as soon as possible.

(*Id.*) The rest of the letter addressed Wray's appeal of his STD denial. (*See id.* at 155–269.)

Wray's counsel submitted the letter to LINA by fax and on a USB thumb drive on the same day. (*Id.* at 283.) In the cover letter accompanying the USB thumb drive, Wray repeated the same first sentence of his "Supplement to Appeal," informing LINA that his counsel "continue[d]" to represent him "in his claim for Short-Term (STD) and Long-Term Disability (LTD) benefits." (*Id.*) LINA did not ultimately request additional information regarding the LTD claim. (Wray Resp. at 21.)

9.  LINA's Review of Second Supplement to Medical Records

Following Wray's submission of his "Supplement to Appeal," LINA sent the additional

evidence to the three doctors responsible for the review of Wray's claim on appeal: Dr. Jain,

(AR 274–79), Dr. Chong, (*id.* at 285–89), and Dr. Rosado, (*id.* at 293–96). All three reviewed

Wray's new evidence and concluded that it did not justify changing their initial findings.

Dr. Jain reviewed notes from Dr. Landrio and Dr. Lewis, additional audiometric

assessments, and Dr. Rosado's review. (*Id.* at 277–78.) He maintained his opinion that "[t]here

are no medically necessary restrictions indicated from a neurological perspective at any time

during the period reviewed and going forward" and found that Wray was not functionally

limited. (*Id.* at 279.) He did, however, defer review of "any psychiatric/psychological

conditions including analysis and interpretation of methodology, validity, raw scores and the

results of any neuropsychological assessment" to the appropriate reviewer. (*Id.*)

Dr. Chong, the reviewing rheumatologist, noted that there were no new rheumatology

notes "specifically addressing additional or continuing manifestations or complications of

GPA" and pointed to the comments of other reviewers regarding hearing loss and cognitive

impairment. (*Id.* at 288.) Dr. Chong also reported additional peer outreach to Dr. Odutola.

On March 21, 2023—after the first denial of Wray's appeal—Dr. Chong was able to connect

via phone with Dr. Odutola, who "agreed that while some autoimmune conditions like GPA

can cause cognitive abnormalities, it was possible that there was some other explanation and

admitted that she was not in the position to assess [cognition] from a training perspective."

(*Id.* at 315.) Dr. Odutola reported that Wray was "credible" and that she encouraged Wray to

- 18 -

obtain neuropsychological testing from a specialist, but that "she was not persuaded that [his] cognitive symptoms were due to vasculitis." (*Id.*) Having reviewed the new information presented, Dr. Chong concluded that "the documentation does not reasonably support changing [the] prior assessment." (*Id.*)

Dr. Rosado, the behavioral medicine specialist, took issue with several aspects of the NPE. First, she noted that, although Dr. Lewis had found Wray's NPE results valid, his "standards scores" were "indicative of marginal / variable validity at best."[7] (*Id.* at 293; *see id.* at 147.) Because Wray's scores indicated possible exaggeration of his cognitive symptoms, the NPE results should therefore be "considered the lowest level of [Wray's] cognitive function." (*Id.* at 293.)

Dr. Rosado also found it possible that Wray was downplaying his psychological symptoms and their contribution to his perceived cognitive issues. Because Wray's psychological function "was assessed only via self-report / self-appraised MH screeners" rather than by "formal symptom validity measures," Dr. Rosado believed the results should be interpreted as "the highest perceived level of function, but not an accurate representation of [Wray's] psychological functioning." (*Id.* at 293–94.) That is, Dr. Rosado believed that Wray's anxiety and depression—which may be treatable—could be playing a greater role in his alleged cognitive difficulties than Wray represented to Dr. Lewis.

---

[7] Because Dr. Lewis incorporated "one test" of validity into the NPE—the TOMM—the logical assumption is that the TOMM scores are those to which Dr. Rosado refers. (*Id.* at 144.)

Finally, Dr. Rosado opined that Dr. Lewis "did not consider all variable[s]" that could contribute to the ultimate NPE test results that led to a diagnosis of mild cognitive impairment. (*Id.* at 294.)  Specifically, Dr. Rosado noted that Wray was prescribed Vyvanse, a stimulant, at the time of testing, but that Wray was not actively taking the medication, which "could contribute to variability in performance." (*Id.*)  Wray also "reported moderate levels of anxiety and depression that were not treated at [the] time of testing and could contribute to variability in NPE results." (*Id.*)

Though Dr. Rosado ultimately agreed with Dr. Lewis' conclusion that Wray's condition was "static and has not declined after [the] 2020 onset of vasculitis and subsequent treatments," Dr. Rosado reiterated that Wray was not functionally limited by his condition and that her "original opinion still stands." (*Id.* at 294, 296.)

On July 27, 2023, LINA notified Wray that it found his STD claim denial was warranted, attaching the reports of all three reviewing doctors. (*Id.* at 300–22.)  Though its letter allowed Wray until August 10 to respond, (*id.* at 306), LINA later granted Wray an extension until August 24, 2023, (*see id.* at 328).

10. Final Disposition of STD Claim

On August 11, Wray sent LINA a response letter that included new information from a visit with Dr. Lewis two days prior. (*Id.* at 328–31.)  In that visit's notes, Dr. Lewis specifically addressed paragraphs in LINA's July 27 letter that he found misleading or inaccurate. (*Id.* at 330.)  Dr. Lewis first indicated that he did not believe Wray had ADHD. (*Id.*)  He next acknowledged that he believed Wray's condition was static but argued that he

still believed Wray evidenced impairment "consistent with memory loss and an atypical dementia" which rendered him unable to work. (*Id.*) Finally, Dr. Lewis argued that, although it appeared Wray was able to perform his activities of daily living ("ADLs") at the time of his disability, "the ability to manage ADLs . . . is not synonymous with the ability to perform as a telecommunications financial and performance analyst." (*Id.*)

The same day, LINA responded to Wray informing him that it would begin another review of his appeal regarding his STD benefits. (*Id.* at 332.) On August 14, Dr. Rosado again reviewed Wray's medical records. (*Id.* at 334–37.) Dr. Rosado addressed Dr. Lewis' response in one line: "The 8/9/23 NP Px's opinions are noted but it does not change the recommendations of the prior reviews." (*Id.* at 337.) Dr. Rosado did not change her assessment. (*Id.* at 335.) Neither did Dr. Jain, who also reviewed Wray's new information. (*Id.* at 341–46.) On August 15, LINA sent Wray the results of this additional review. (*Id.* at 350–57.)

On August 17, 2023, Wray responded to LINA's letter expressing disappointment with Dr. Rosado's cursory treatment of Dr. Lewis' response. (*Id.* at 372–74.) Wray requested that LINA address five specific questions relating to LINA's explanations for the STD claim denial and the apparent weighing of Dr. Rosado's opinion over Wray's own providers. (*Id.* at 373.) In response, LINA advised that its Medical Director in Neuropsychology and Psychology would review Wray's questions and would conduct a peer-to-peer call with Dr. Lewis. (*Id.* at 375.)

On August 19, LINA informed Wray that it would need a 45-day extension to resolve his appeal.  (*Id.* at 377.)  On August 30, Wray informed LINA that he believed it had already requested its single 45-day extension when it failed to provide a decision on or before July 17, 2023.  (*Id.* at 383.)  According to Wray, LINA would therefore be required to issue a decision by September 18, 2023.  (*Id.*)  On September 15, LINA informed Wray that "[its] medical director advised that the purpose of the peer to peer call [with Dr. Lewis] would not be beneficial when the type of examination completed by Dr. John D. Lewis did not include the appropriate validity testing."  (*Id.* at 385.)  LINA concluded that Wray's appeal was "under final review for a decision."  (*Id.*)  Three days later, on September 18, LINA issued a letter upholding the prior denial of Wray's STD benefits claim.  (*Id.* at 387–95.)

Wray seeks an order "clarif[ying] a plan beneficiary's rights to past and future benefits under the terms of an employee welfare plan."  (Am. Compl. ¶ 2.)  Wray's requested relief includes "a declaration and enforcement of rights" under the short-term disability ("STD") and long-term disability ("LTD") insurance policies at issue or the employee benefit plan, "an instatement of benefits," "the payment of all back benefits due with pre-judgment and post-judgment interest," "the enforcement of rights under the short-term and long-term disability insurance policies and/or the employee benefits plan," and "the clarification of rights to future benefits under the short-term and long-term disability insurance policy and/or the employee benefits plan" under 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).  (*Id.*)  Wray also seeks an award of attorneys' fees and costs.  (*Id.*)

- 22 -

**B. Procedural History**

On September 19, 2023, Wray filed a complaint against LINA in the District Court for the Western District of Virginia. (Dkt. 1.) LINA filed an answer to that complaint on November 16, 2023. (Dkt. 3.) On February 12, 2024, Chief Judge Michael F. Urbanski granted Wray's subsequent motion for leave to amend his complaint. (*See* Dkts. 10, 12.) Wray filed his amended complaint the same day. (Am. Compl. (Dkt. 13).) The amended complaint named WMP as an additional defendant and sought relief pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). (*Id.* at 1–2.) LINA filed an answer to the amended complaint eleven days later, (Dkt. 17), but ultimately filed an amended answer on March 13, 2024, (Dkt. 21). Following several extensions of time, WMP filed its answer on May 1, 2024. (Dkt. 30.) Judge Urbanski granted LINA's unopposed motion to seal the administrative record three weeks later. (Dkt. 38.)

On August 12, 2024, LINA filed a "Motion of Defendant Life Insurance Company of North America (1) For Summary Judgment, Or, In the Alternative, (2) For Remand, Or, Further in the Alternative, (3) For Judgment on the Administrative Record." (Dkt. 43.) The same day, Wray filed a motion for judgment on the administrative record pursuant to Federal Rule of Civil Procedure 52, (Dkt. 45), and WMP filed a motion for summary judgment under Federal Rule of Civil Procedure 56 (Dkt. 47). After this court granted the parties' consent motion to modify the briefing schedule, (Dkt. 51), all three parties filed responses to the pending motions on September 19, (Dkts. 52, 53, 54), and replies on October 3, (Dkts. 56, 57, 58).

## II.    Legal Standards

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). When considering a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties, *Celotex*, 477 U.S. at 322, but it "cannot weigh the evidence or make credibility determinations," *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 959 (4th Cir. 2022) (quoting *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015)).

A challenged denial of benefits is reviewed under an abuse-of-discretion standard where, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "The abuse-of-discretion standard is a deferential one and the decision of the plan trustees will not be disturbed if it is reasonable, even if [the court] would have come to a different conclusion independently." *Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 851 (4th Cir. 2023) (internal quotation marks omitted); *see Weisman v. Guardian Life Ins. Co. of Am.*, 710 F. Supp. 3d 537, 545 (W.D. Va. 2024). In assessing the reasonableness

- 24 -

of the administrator's decision, the court may consider several non-exhaustive factors, including:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). Not all of the *Booth* factors will be relevant in every case, and the court need not expressly discuss those which are irrelevant. *See Helton v. AT&T Inc.*, 709 F.3d 343, 357–59 (4th Cir. 2013).

### III.    Analysis

Resolution of these motions raises three main issues: (1) whether Wray's LTD claim was appropriately exhausted; (2) whether the court should analyze his STD claim under *de novo* or abuse-of-discretion review; and (3) the merits of Wray's underlying STD claim. The court will address each in turn.

### A.  LTD Claim

Though ERISA does not explicitly mandate administrative exhaustion, "an ERISA claimant generally is required to exhaust the remedies provided by the employee benefit plan in which he participates as a prerequisite to an ERISA action for denial of benefits under 29 U.S.C. § 1132." *Wilson v. UnitedHealthcare Ins. Co.*, 27 F.4th 228, 241 (4th Cir. 2022) (quoting

*Makar v. Health Care Corp. of Mid-Atl. (CareFirst)*, 872 F.2d 80, 82 (4th Cir. 1989)).  Claimants must therefore generally "follow the Plan's internal procedures for a full and fair review of a plan administrator's denial of a claim for benefits." *Id.* (internal quotation marks omitted). Courts have, however, excused a failure to exhaust when plaintiffs have produced a "clear and positive showing" that pursuit of internal remedies would prove "futile." *Id.* (quoting *Makar*, 872 F.2d at 83).  "When exhaustion is excused, the district court may consider the claimant's entitlement to benefits in the first instance." *Id.* at 242 (internal quotation marks omitted). But, where there is "procedural noncompliance with ERISA's full and fair review process," the Fourth Circuit has held that "the appropriate relief is to remand for the administrative process to be properly applied." *Id.* (citing *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 239–42 (4th Cir. 2008)).

LINA first argues that it is entitled to summary judgment with respect to Wray's LTD claim because Wray failed to exhaust his administrative remedies.  (Mem. of Def. LINA in Supp. of Mot. for Summ. J. at 18–25 (Dkt. 44) [hereinafter "LINA Mem."].)  LINA argues that Wray's failure to exhaust manifests in two ways: failure to submit a valid notice of his LTD claim, and failure to timely file that claim.  (*Id.*)  The court finds that Wray did indeed fail to exhaust his LTD claim and that LINA is entitled to summary judgment on this count.

### 1.  Lack of Notice

LINA notes that the LTD policy outlines a specific procedure required to initiate a claim: the claimant must submit to LINA written notice including the employer's name, the LTD policy number, and the claimant's name and address.  (*Id.* at 19; AR 1348.)  LINA argues

that Wray "eschewed the LTD process entirely and instead attempted to assert an LTD claim

by referencing it within his STD appeal." (LINA Mem. at 19.) Wray's July 12 "Supplement

to Appeal" letter only mentioned LTD benefits in one paragraph and did not include Wray's

LTD Policy number or address. (*Id.*; *see* Declaration of Alexandria Collins ¶¶ 6–7 (Dkt. 44-1)

[hereinafter "LINA Decl."].) Nor did Wray communicate further with LINA about his LTD

benefits following the "Supplement to Appeal." (LINA Mem. at 19; LINA Decl. ¶ 7.) LINA

thus contends Wray did not comply with LTD policy terms or provide sufficient notice of an

LTD claim as required under the LTD policy. (LINA Mem. at 19–20.)

      Wray, for his part, contends that notice of his LTD claim was clearly stated on the first

page of the "Supplement to Appeal" letter in a passage that read:

> As an initial matter, to the extent [LINA] has not already opened an LTD claim
> for Mr. Wray, please let this letter serve as notice of his application for LTD
> benefits. For his LTD claim, we incorporate by reference all records from his
> STD file, including but not limited to the documents we are attaching in this
> appeal supplement. If [LINA] requires any forms or anything else to process
> his LTD application, please let us know as soon as possible.

(Resp. in Opp'n to Defs.' Mots. for Summ. J. at 20–21 (Dkt. 53) [hereinafter "Pl.'s Resp."];

AR 155.) Both the first page of the "Supplement to Appeal" letter and its separate cover letter

also inform LINA that Wray's attorney "continues to represent [him] in his claim for Short-

Term (STD) and Long-Term Disability (LTD) benefits under his group STD and LTD plan

provided by his employer, West Monroe Partners Inc." (AR 155, 283.) Wray observes that

LINA did not request additional information or suggest that this notice was in any way

deficient and argues that, if LINA *did* fail to notice his statements, that only provides evidence

that LINA insufficiently reviewed Wray's STD appeal and supporting documentation. (Wray Resp. at 21.)

The court finds LINA's argument more persuasive. The record does not show any evidence that Wray initiated a claim pursuant to the LTD Policy's requirements for notice: neither Wray's "Supplement to Appeal" nor his cover letter included Wray's LTD policy number or address, as was required by the LTD Policy. (*See* AR 1348.) Nor does the record show that Wray or his counsel's actions put LINA on notice that Wray properly initiated a claim under the LTD Policy. *See Isaacs v. Metro. Life Ins. Co.*, 281 F. App'x 240, 243–45 (4th Cir. 2008).

In fact, the court finds Wray's attempts to initiate an LTD claim substantially similar to those discussed by the Fourth Circuit in *Isaacs v. Metropolitan Life Insurance Co.*, where a plaintiff in the process of appealing his STD claim denial mentioned only briefly his intent to initiate an LTD claim to the insurance company that administered both plans. *Id.* at 241–42. There, Isaacs' attorney first submitted a letter to the insurance company captioned "Short-Term Disability Claim," which referenced only the Isaacs' STD claim number. *Id.* at 242–43. The first sentence of the letter, however, read: "Please be advised that I have been retained to represent [the plaintiff] in connection with the appeal of your denial of his claim for long term disability benefits." *Id.* at 243 (emphasis omitted). After a request for review of Isaacs' claim and a copy of the administrative record, the letter's penultimate paragraph addressed the LTD claim directly:

- 28 -

> The third purpose of this letter is with regard to my client's LTD claim. My client has been out long enough to where it is time to get her [sic] LTD claim in the works. If you could please forward any LTD claim forms or other documentation that needs to be completed in order to prefect [sic] the filing of that claim I would be most appreciative. If the LTD claim rolls over automatically after payment in full of the STD benefits then please just advise and I will proceed with the STD claim since, essentially, it will be considered the same claim.

*Id.* The insurance company did not respond to this letter. A few months later, Isaacs' counsel sent a second letter to the insurance company referencing the plaintiff's STD claim and listing his STD claim number but explaining that he was "appealing the denial of *both* [plaintiff's] claim for short term disability and long term disability benefits." *Id.* Isaacs did not follow up on his LTD claim after these letters. *Id.* Analyzing this series of events, the Fourth Circuit found that Isaacs had "never properly initiated" an LTD claim and that his attorney's letters "were likewise insufficient either to initiate an LTD claim or to put [the insurance company] on notice that Isaacs believed that such a claim existed separate and apart from his STD claim." *Id.* at 244–45. The court affirmed summary judgment to the insurance company because the record did not contain a completed claim for LTD benefits. *Id.* at 241, 245.

Like *Isaacs*, Wray's letter informed its recipient that the claimant intended to proceed with an LTD claim. Both letters also requested from the insurance company the forms or documentation that would be required to process an LTD application. *See Richardson v. Astellas U.S. LLC Employee Ben. Plan & Life Ins. Co. of N. Am.*, 610 F. Supp. 2d 947, 952–53 (N.D. Ill. 2009) (finding no LTD claim initiated where plaintiff requested claim forms from insurance company). And both letters informed the recipient that the LTD claim would be based on

the records from the existing STD claim.  But where Isaacs' "notice" was found on two pages
of a three-page letter, Wray's was on a single, albeit the first, page of a 115-page submission
to LINA.  And where Isaacs' attorney followed up again about the LTD claim two months
after the initial letter, Wray's attorney mentioned the LTD claim only in two letters submitted
to LINA the same day without further follow-ups.  Therefore, the court finds that Wray's
single paragraph in the "Supplement to Appeal" and his cover letter, neither of which
complied with the LTD policy's notice requirement, are insufficient to constitute a valid LTD
claim.  Because Wray did not properly initiate an LTD claim, the court finds he has failed to
exhaust the LTD Policy's administrative procedures.

> 2.  Timeliness

Even had Wray initiated an LTD claim with his "Supplement to Appeal," the claim
would be untimely under the LTD policy.  The LTD Policy sets out time constraints for the
initiation of claims: notice must be provided to LINA "within 31 days after a covered loss
occurs or begins or as soon as reasonably possible."  (AR 1348.)  However, "[i]f written notice,
or notice by any other electronic/telephonic means authorized by [LINA], is not given in that
time, the claim will not be invalidated or reduced if it is shown that notice was given as soon
as was reasonably possible."  (*Id.*)  The claimant is also required to submit written proof of
loss "within 90 days after the date of the loss for which [the] claim is made."  (*Id.*)  However,
that deadline may be extended up to one year after the initial 90-day period "if it is shown that
[the written proof of loss] was given as soon as was reasonably possible."  (*Id.*)

Though the exact date of the onset of Wray's alleged disability is unclear, at the latest his symptoms began on December 1, 2022—the first day Wray failed to report to work at West Monroe.[8]  Wray submitted his initial STD claim on December 2, 2022, and corresponded with LINA regarding that claim throughout the spring.  It was only on July 12, 2023—well more than 31 days after the latest possible onset of his symptoms—that Wray attempted to initiate an LTD claim.  Because Wray did not meet LINA's deadline for initiation of a claim, and because Wray does not argue that the filing was undertaken "as soon as reasonably possible," the court finds that Wray did not provide timely notice to LINA of his LTD claim.

Nor did Wray submit written proof of loss within 90 days of December 1, 2022.  In fact, it is unclear whether Wray provided written proof of loss at all; if, however, the court construes the July 12 "Supplement to Appeal" as proof of loss (given that it is the only document in the record that substantively mentions the LTD claim), Wray's filing still falls well outside of the 90-day window for filing.  Because Wray does not argue that the filing was undertaken "as soon as reasonably possible," the court finds the LTD Policy's one-year extension does not apply and the written proof of notice was not timely filed.

Having determined that Wray did not appropriately file an LTD claim, the court now turns to the appropriate remedy.  To begin, Wray asks that the court undertake a *de novo* review of the LTD claim because he has exhausted his administrative remedies.  (Wray Resp. at 18–

---

[8] Though the court notes Wray's STD and LTD claims require him to meet two different standards for disability, Wray's purported LTD claim notice in his "Supplement to Appeal" relies explicitly on the submitted documentation for his STD claim.  (AR 155.)  The court therefore concludes that Wray's LTD claim would be based on the same symptoms and condition underlying his STD claim.

26.)  Because the court finds Wray did not exhaust his administrative remedies, it will deny his

motion as to the LTD claim.

Next, LINA argues that the court should grant summary judgment in its favor on the

LTD claim because Wray failed to exhaust his administrative remedies and no longer can

timely do so.  (LINA Mem. at 25.)  In the alternative, it argues that the claim should be

remanded to LINA to render a decision in the first instance.  (*Id.* at 25–31.)  Even were Wray

to file his LTD claim today and demonstrate that he had done so "as soon as reasonably

possible," well more than one year and 90 days have passed since the onset of his symptoms.

Accordingly, any claim filed would be untimely pursuant to the LTD Policy's internal

deadlines.  Because Wray failed to exhaust his administrative remedies and his LTD claim is

now time-barred, the court will grant LINA's motion for summary judgment as to the LTD

claim.

### B.  STD Claim

#### 1.  Standard of Review

Turning to Wray's STD claim, at the outset the parties disagree as to the appropriate

standard of review.  Wray argues that the denial decision is entitled to *de novo* review because

the STD Plan is subject to Illinois law, which Wray contends "voids any grant of discretionary

authority" to a plan fiduciary.  (Wray Mem at 2–4); *see* 50 Ill. Admin. Code § 2001.3.  WMP,

however, argues that Wray's claim is subject to an abuse-of-discretion standard because the

STD Plan "provides discretionary authority to a fiduciary [LINA] to decide benefits claims,"

(WMP Mem. at 15), and because the court is therefore required to defer to LINA's

discretionary denial decision "even if the court itself would have reached a different conclusion." (*Id.* at 15–16 (quoting *Lance v. Ret. Plan of Int'l Paper Co.*, 331 F. App'x 251, 254 (4th Cir. 2009)).)

In determining which standard of review to apply, the court first undertakes a *de novo* review of the ERISA plan's terms to determine "whether the plan's language grants the administrator discretion to determine the claimant's eligibility for benefits." *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). Though such a grant may be created by implication, the plan's terms must "indicate a clear intention to delegate final authority" over eligibility determinations to an administrator or fiduciary. *Id.* at 523. If a plan explicitly or implicitly grants final authority "to determine eligibility for benefits or to construe the terms of the plan," the court then applies the abuse-of-discretion standard to the claim determination. *Firestone*, 489 U.S. at 115. If it does not, the court reviews the benefits decision *de novo*. *See Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322–24 (4th Cir. 2008) (applying *de novo* standard).

The STD Plan explicitly vests discretionary authority in LINA: it grants LINA "the authority, *in its discretion*, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." (AR 47 (emphasis added); *see id.* at 65, 83, 101.) And the STD Plan renders LINA's decisions "final and binding on Participants and Beneficiaries to the full extent permitted by law." (*Id.* at 47, 65, 83, 101.) The court finds this a clear delegation of discretion sufficient to warrant the

- 33 -

abuse-of-discretion standard of review.  *See Booth*, 201 F.3d at 343–44 (finding similar language to warrant abuse-of-discretion standard).

Moreover, contrary to Wray's arguments, the court finds nothing to suggest that the STD Plan's delegation of discretionary authority to LINA is unlawful.  The language Wray relies upon in arguing that the STD Plan is contrary to Illinois law is irrelevant, given that he cites only to the LTD Policy's choice of law provision and not to any analogous provision in the STD Plan.  (*See* AR 1325.)

Even if there were a choice of law provision that rendered the STD Plan subject to Illinois law, the court notes that no provision of Illinois law appears incompatible with the delegation of discretionary authority to LINA.  Wray relies heavily on the following regulation promulgated by the Illinois Department of Insurance (DOI) in his argument to the contrary, which reads:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, *by a health carrier*, to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services or of a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

50 Ill. Admin. Code tit. 50, § 2001.3 (Section 2001.3) (emphasis added); (*see* Wray Mem. at 3; Wray Resp. at 18–19).  To begin, the parties do not discuss whether the STD Plan was "offered or issued" in Illinois, and the court finds the facts before it insufficient to make such a determination.  *See Nasalroad v. Standard Ins. Co.*, 182 F. Supp. 3d 879, 880–81 (S.D. Ill. 2016) (discussing the various factors that contribute to this determination).

- 34 -

Section 2001.3 is a regulation applicable to insurance policies issued in Illinois but does not apply to self-funded plans such as the STD plan at issue. Because the STD Plan is self-funded by WMP, which is not a health carrier, and LINA serves only as the claim administrator, Section 2001.3 does not void the discretionary authority WMP delegated to LINA. *See FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990) (holding that the "deemer" clause exempts self-funded ERISA plans from state laws that regulate insurance within the meaning of the ERISA savings clause); *OSF Healthcare Sys. v. Boyd Benefits*, No. 1:12-cv-01413, 2014 WL 12734917, at *2 (C.D. Ill. Sept. 12, 2014) (holding that the "deemer" clause exempts self-funded ERISA plans from state laws that "regulate insurance" such as Section 2001.3); *see also Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1135–36 (9th Cir. 2017) (holding that the "deemer" clause preempts state insurance law's ban of discretionary clauses as applied to self-funded ERISA plans.)

Because Wray points to no other evidence in the record demonstrating that the STD Plan is subject to any other state law that would invalidate the delegation of discretionary authority, the court finds WMP's delegation of discretionary authority to LINA lawful.

2. Analysis

Because the STD Plan provides discretionary authority to LINA to determine eligibility for benefits, the court will use the abuse-of-discretion standard and assess whether the plan administrator's decision in this case was reasonable under the non-exhaustive *Booth* factors. Again, under this highly deferential standard of review, the court looks to see if LINA's decision followed a "deliberate, principled reasoning process" and is "supported by substantial

evidence." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (quoting *Guthrie v. Nat'l Rural Elec. Coop. Ass'n Long Term Disability Plan*, 509 F.3d 644, 651 (4th Cir. 2007)). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Geiger v. Zurich Am. Ins. Co.*, 72 F.4th 32, 38 (4th Cir. 2023) (citing *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011)).

   *i.   Language of the Plan*

The first *Booth* factor considers whether LINA adhered to the "language of the plan" in rendering its benefits decision. *Booth*, 201 F.3d at 342. At the outset, the court notes that it is undisputed that LINA's decision to deny Wray benefits under the STD Plan "fell *within the scope* of the discretionary authority conferred on it." *See Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 380–81 (4th Cir. 2018) (emphasis in original). The STD Plan granted LINA "the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact," (AR 47; *see id.* at 65, 83, 101), and LINA's decision does indeed constitute a determination of eligibility benefits.

Wray, for his part, argues that LINA went beyond the Plan's language in terminating his benefits. Specifically, Wray takes issue with LINA's failure to conduct a formal vocational review, which Wray argues rendered it "impossible for LINA to 'distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination' regarding Mr. Wray's disability." (Wray Mem. at 36 (quoting *Sapp v. Liberty Life Assurance Co. of Boston*, 210 F. Supp. 3d 846, 851 (E.D. Va. 2016)).) Because the STD Plan provides coverage

if an employee is "unable to perform all the material duties of [his] Regular Job," Wray argues

that LINA's failure to discuss the vocational review he provided, or to conduct one of its own,

demonstrates that LINA did not adhere to the language of the plan in making its decision.

(Reply to Defs.' Opp'n Brs. at 26–27 (Dkt. 57) [hereinafter "Wray Reply"].)  Wray also points

to claim notes by LINA's clinical staff finding that new medical evidence "[did] not change

previous recommendation" to deny benefits because "total functional loss remain[ed] unclear"

as evidence that LINA was placing on Wray an unduly high burden to prove his disability.

(Wray Mem. at 9–10, 30–31; AR 1023.)

    In response, LINA argues that "[b]ecause [it] determined that [Wray] did not meet the

definition of disability under the STD Plan, a vocational assessment was not necessary."

(LINA Resp. at 37–38.)  That is, because LINA's reviewing doctors found that Wray exhibited

no limitations whatsoever, a vocational evaluation would necessarily result in a finding that

Wray could perform the duties of his regular job.  It also deems the reviewing nurse's comment

about "total functional loss" a "stray remark" that is "immaterial" because "LINA did not

issue its denial decision based on this standard and it properly applied the terms of the STD

Plan."  (*Id.* at 34 n.10.)

    The court finds LINA's argument persuasive.  None of LINA's reviewing doctors

found that Wray was functionally limited in any way and accordingly did not recommend any

activity restrictions.  An analysis of the functions and duties of Wray's job would therefore

have proven irrelevant—because Wray had no limitations or restrictions, it simply would not

matter what his job entailed. Failure to perform a vocational assessment in these circumstances does not plainly contradict the language of the Plan.

Moreover, the court agrees with LINA that a lone comment from a reviewing nurse observing Wray did not experience "total functional loss" does not amount to a departure from the language of the Plan. It is apparent from the language of LINA's denial letters that LINA considered more than this single factor in reaching its benefits determination. For instance, LINA mentioned that "there was no clinical evidence to support a severe and total functional loss" in all three letters in 2023 denying Wray's appeal: on July 27, (AR 305), August 15, (AR 355), and September 18 (AR 392). But these observations came in the context of lengthy letters also observing, multiple times, that Wray's "medical documentation did not provide evidence of any continuous impairments resulting in limitations or presence of any conditions that would require restrictions." (AR 303, 304; *id.* 353, 355, 356; *id.* 390, 392, 394.) A single statement by LINA noting that Wray is not totally and completely impaired does not negate the fact that LINA adhered to the language of the STD Plan in making its determinations. Because LINA did not plainly eschew the Plan language and the Plan's clear language provides LINA with discretionary authority "to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact," (*id.* at 47; *see id.* at 65, 83, 101), the court finds that the first *Booth* factor weighs neither for nor against Wray. Rather, this factor highlights the abuse-of-discretion review that the court must employ in reviewing LINA's decision.

*ii. Adequacy of Materials Considered & Degree of Support*

The court next assesses "the adequacy of the materials considered to make the decision and the degree to which they support it." *Booth*, 201 F.3d at 342. Here, as in many cases, the record contains conflicting opinions of medical providers. Where that is the case, "it is the ERISA fiduciary's duty to resolve the conflicts and it is not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports were presented." *Wilson*, 27 F.4th at 240 (internal quotation marks omitted). However, "[w]hile an administrator has the authority to weigh conflicting pieces of evidence, it abuses its discretion when it fails to address conflicting evidence." *Helton*, 709 F.3d at 359; *see Donovan v. Eaton Corp., Long Term Disability Plan*, 462 F.3d 321, 329 (4th Cir. 2006) (finding fiduciary's "wholesale disregard" of conflicting evidence an abuse of discretion).

So, too, must the plan fiduciary consider a claimant's self-reported symptoms in making its benefits determination: "The Fourth Circuit has recognized that an insured's subjective assessment of symptoms is relevant and cannot be disregarded or ignored by the insurer." *Weisman v. Guardian Life Ins. Co. of Am.*, 710 F. Supp. 3d 537, 550 (W.D. Va. 2024) (citing *Donovan*, 462 F.3d at 327). When a plan does not contain a provision requiring that a claimant's submission of proof be based on objective evidence, a claim fiduciary cannot reasonably deny a claim solely because it was based on subjective evidence. *DuPerry*, 632 F.3d at 873. Nevertheless, a claim fiduciary acts within its discretion when it weighs that subjective evidence against any other evidence presented, even if it ultimately chooses to deny a claim

for benefits.  *See, e.g.*, *Griffin*, 898 F.3d at 382 (finding no abuse of discretion where plan fiduciary denied benefits despite claimant's self-reported symptoms).

Here, the court finds that LINA considered adequate materials in determining that Wray was not entitled to benefits under the STD Plan.  LINA relied on the opinions of three reviewing medical providers, who collectively discussed Wray's previous medical visits, testing, and self-reported symptoms, to make its denial determination.  (AR 387–94.)  LINA addressed throughout the medical evidence (or lack thereof) that would have supported it deciding in favor of Wray, including the conclusions of his treating physicians.  LINA also provided Wray ample opportunity to submit evidence of his own, which LINA then addressed in each subsequent denial letter.  Though Wray argues that LINA was "willfully blind" to the opinions of his medical providers—most significantly, Dr. Lewis' opinion—the administrative record does not support Wray's argument.  (Wray Mem. at 33–34.)

Contrary to Wray's contentions, LINA identified that Dr. Odutola's proposed restrictions "were not supported" because of conflicting medical evidence: namely, the normal results from the MRI, MRA, and MMSE tests.  (AR 389.)  LINA also observed that "[i]t was unclear if [Dr. Odutola] did any probing or accepted [Wray's] complaints of cognitive decline in lieu of testing."  (*Id.*)  Though Wray's self-reported symptoms are entitled to consideration, the visit notes of a physician restating those same self-reports do not lend Wray's subjective evidence greater weight—that a doctor simply records a patient's complaints does not alone

increase those complaints' credibility.[9]  LINA did not abuse its discretion in observing that Dr. Odutola's opinion appeared to be based solely on Wray's self-reported symptoms and weighing the evidence presented accordingly.

Similarly, LINA addressed Wray's visit with Ochoa, finding that "[t]he nurse's assessment of [his] mild cognitive impairment was based on [his] self-report and wife's history, and there was no actual testing." (*Id.*)  LINA noted that the visit with Ochoa also documented that Wray's judgment was intact and that the one objective test performed—the MMSE—indicated normal cognition. (*Id.*)  Additionally, a peer call with Ochoa revealed that she "was not recommending any restrictions and there were no identified limitations." (*Id.* at 390.) Though Wray contends that Ochoa's June 15 letter rebuts that statement, *(see* Wray Mem. at 12–13)*,* Ochoa's letter merely clarifies that she was not affirmatively stating that Wray had the capacity to work and that she recommended further testing for a formal diagnosis, (AR 218.)

Finally, LINA reported the results of Dr. Lewis' NPE but explained that they represented "the lowest level" of Wray's cognitive function due to his marginal validity scores. (AR 392.)  It also recognized that Wray had self-reported mental health symptoms as part of the NPE but that the test did not assess those symptoms via any formal validity measures.

---

[9] A plaintiff cannot strong-arm his way into ERISA benefits simply by reporting his symptoms to multiple physicians and then submitting those physicians' visit notes (which only record the plaintiff's complaints) as additional medical documentation.  Rather, visit notes that only reiterate a plaintiff's self-reported symptoms may reasonably be considered alongside the plaintiff's subjective evidence and not be given independent significance.  Visit notes that record self-reported symptoms but additionally contribute independent testing or observations corroborating those symptoms, however, or those whose timing helps to establish the credibility of the plaintiff's complaints, may lend self-reported symptoms greater weight in the benefits determination.

(*Id.*)  Though Wray complains that LINA did not take Dr. Lewis' final rebuttal responses into account, (Wray Mem. at 32), Wray fails to acknowledge that those responses did not in any way address Dr. Rosado's main criticism of the NPE—that Wray's scores on the TOMM indicated variable validity and therefore were less credible.  Though Wray may disagree with LINA's ultimate decision, it is a far cry to claim that LINA was "willfully blind" to these medical professionals' opinions when it so clearly explains its reasoning in finding against him.

Wray also contends that LINA overlooked the opinion of Dr. Landrio in making its benefits determination.  (Wray Resp. at 36.)  But office notes from that visit demonstrate that Dr. Landrio did not offer an opinion regarding Wray's cognition; rather, he recorded Wray's self-reported symptoms and the results of his tests with other providers.  (AR 267–68.)  Even if there were an opinion to be addressed, both Dr. Chong and Dr. Jain noted that they considered Wray's June 29 visit to Dr. Landrio in their reports.  (*See* AR 315, 320, 344.) Though LINA may not have explained how or why it chose to weigh the visit with Dr. Landrio the way that it did, the court cannot here find that LINA's decision was unreasonable.

In fact, the only opinion Wray can reasonably claim LINA ignored was that of Atkinson, the vocational specialist.  (*See* Wray Reply at 26.)  LINA did not address Atkinson's evaluation that Wray required work restrictions in any of its communications to Wray, nor did it appear to provide that evaluation to its reviewing medical providers.  As discussed above, LINA has argued persuasively that such an evaluation is irrelevant when the medical evidence does not support a finding of disability.  As such, the court finds that LINA has still considered adequate evidence in making its benefits determination and that such decision was reasonable.

The court ultimately finds that the evidence reasonably supports LINA's decision to deny Wray benefits under the STD Plan.  There are sufficient facts in the record to support LINA's finding that Wray was not disabled: namely, the MRI, MRA, and MMSE test results, Wray's providers' observations of his intact judgment and normal cognition, and his self-reported ability to perform complex tasks.  Weighed against Wray's self-reported symptoms, the opinions of medical providers based solely on those self-reported symptoms, and the results of an NPE that indicated possible malingering, the court finds LINA's decision reasonably supported by the materials considered in its evaluation.  Therefore, this *Booth* factor weighs in favor of LINA.

### iii.  Reasoned and Principled Decision-Making Process

The court now turns to "whether the decision[-]making process [by LINA] was reasoned and principled"—a factor that in many ways overlaps with the "adequacy of the materials considered" described above.  *Booth*, 201 F.3d at 342; *see Helton*, 709 F.3d at 359 (using the same reasons to evaluate both factors).  ERSIA envisions a benefits determination to be a "collaborative undertaking," wherein the claim fiduciary and claimant engage in a back-and-forth about the medical evidence supporting the claim.  *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 23 (4th Cir. 2014).  A reasoned and principled decision-making process "does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim."  *Id.* at 21.  Though claim fiduciaries need not "scour the countryside in search of evidence to bolster a petitioner's case," they still must notify a claimant if there exists "specific information that they were aware was missing and

that was material to the success of the claim" so that the claimant has an opportunity to provide the missing information. *Id.* at 21–22. However, "the primary responsibility for providing medical evidence to support a claimant's theory rests with the claimant," not the claims fiduciary. *Wilkinson v. Sun Life & Health Ins. Co.*, 674 F. App'x 294, 301 (4th Cir. 2017) (quoting *Harrison*, 773 F.3d at 24).

Wray contends that LINA failed to respond appropriately to the medical documentation he submitted in support of his claim. (*See* Wray Mem. at 27–28, 29–34.) Notwithstanding the court's findings as to the other *Booth* factors, the court finds that LINA engaged in an extensive dialogue with Wray and that, at times, Wray failed to submit evidence to refute the conclusions LINA outlined in its denial letters. LINA's failure to consider irrelevant evidence or responses—such as Atkinson's vocational review or Dr. Lewis' letter (which did not address Dr. Rosado's primary concern with the NPE)—does not amount to a failure to engage in reasoned and principled decision-making. Nor does LINA's September 15 decision not to call Dr. Lewis rise to the level of unreasonableness. LINA gave Dr. Lewis an opportunity to address its concerns about the validity of the NPE. And Wray's August 17 letter did not suggest that Wray had any additional medical documentation to provide, including any materials from Dr. Lewis. LINA had no obligation to further inquire into Wray's condition when there was no indication that there was missing information that would be material to Wray's claim. *See Harrison*, 773 F.3d at 21–22.

Instead, the court finds that LINA's decision-making was reasoned and principled. LINA provided Wray with multiple opportunities to provide additional medical

documentation, including during his appeal process. LINA employed three specialist physicians to undertake independent reviews of Wray's claim. *See Learn v. Lincoln Nat'l Life Ins. Co.*, 724 F. Supp. 3d 494, 526 (W.D. Va. 2024) (finding the same "indicia that [the insurance company] employed a reasoned and methodical process"). LINA issued lengthy letters describing the reasoning for its decision and including the opinions of its reviewing physicians. In short, there was "extensive back-and-forth between [LINA] and [Wray] at every step" of LINA's review. *See Pifer v. Lincoln Assurance Co. of Boston*, No. 1:22-cv-186, 2023 WL 5208111, at *19–20 (M.D.N.C. Aug. 14, 2023). LINA's benefits determination is not unreasoned or unprincipled merely because it did not result in the outcome Wray desired.

Wray also suggests that LINA's failure to request an independent medical examination "raises serious concerns about the thoroughness and accuracy of [LINA's] benefits determination." (Wray Mem. at 28–29.) The STD Plan allows LINA "the *right* to examine any person for whom a claim is pending as often as it may reasonably require." (AR 65 (emphasis added).) The Plan does not impose upon LINA an obligation to conduct such an examination. *See Griffin v. Hartford Life & Accident Ins. Co.*, No. 616-cv-00024, 2017 WL 384384, at *6 (W.D. Va. Jan. 25, 2017). And "a plan administrator is under no duty to secure specific forms of evidence." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999); *see Moore v. Liberty Life Assur. Co. of Boston*, 129 F. Supp. 3d 408, 426–27 (W.D. Va. 2015) (finding no requirement to affirmatively seek an independent medical examination). Additionally, the burden of proving disability lies with the claimant, *see Elliott*, 190 F.3d at 608, and Wray has not claimed (nor could he) that he could not legally obtain a physical examination himself.

Accordingly, Wray cannot successfully argue that LINA's decisionmaking was flawed because it failed to take a step that it was not required to take, and that Wray bore the burden to take himself if he thought it would prove his claim. This *Booth* factor therefore weighs in favor of LINA.

     iv. *Other* Booth *Factors*

Wray argues that three additional *Booth* factors "strongly favor" his position: the "purposes and goals of the plan," "whether the decision was consistent with the procedural and substantive requirements of ERISA," and "any external standard relevant to the exercise of discretion." (Wray Resp. at 27.)

The "purposes and goals of the plan" constitute the second *Booth* factor. *Booth*, 201 F.3d at 342. Wray does not clarify how the "purposes and goals" of the STD Plan support his position over LINA's, and the court does not find any reason to conclude that they do. The court therefore finds the second *Booth* factor weighs neither for nor against Wray.

The sixth *Booth* factor asks the court to consider "whether the decision was consistent with the procedural and substantive requirements of ERISA." *Id.* Wray appears to argue that LINA, by failing to meet the strict 45-day deadline given for claims decisions under ERISA and failing to provide notice that it needed an extension before that date, *see* 29 C.F.R. § 2560.503-1(f)(3), has not complied with the statute's requirements. (Wray Resp. at 26.) While Wray is correct that such an overstep may constitute a procedural violation, this court need not address the issue here. The court's review of the administrative record reveals that Wray appears to have miscalculated the dates of LINA's review: by its count, LINA's

September 18 letter denying Wray's appeal was issued within the 45-day time period. Accordingly, LINA was not in violation of ERISA and the sixth *Booth* factor weighs neither for nor against Wray.[10]

Finally, the court considers "any external standard relevant to the exercise of discretion" as the seventh *Booth* factor. *Booth*, 201 F.3d at 342. Though Wray claims this factor weighs strongly in his favor, he does not explicitly point to an external standard for the court's consideration in relation to his STD claim. Although Wray *does* suggest the court consider LINA's Claim Policies in relation to his LTD claim, the court notes that the provisions mentioned relate only to the timeliness of filed claims and not to applicable standards of review when making a claim determination. (Wray Resp. at 22–23, 25–26.) Accordingly, the court finds this factor weighs neither for nor against Wray.

Because the *Booth* factors, taken as a whole, weigh in favor of LINA, the court finds that LINA did not abuse its discretion in denying Wray's claim for benefits under the STD Plan. "So long as sufficient evidence supports the decision, and the process by which the determination was made is principled and reasoned," a court may not question the administrator's denial of benefits. *Wilson*, 27 F.4th at 240. Therefore, the court ultimately finds LINA engaged in principled and reasoned decision-making while considering sufficient evidence.

---

[10] Even if LINA *were* in violation of ERISA, however, the court notes that although this factor would weigh in favor of Wray, it would not suffice to overcome the above factors weighing against him.

### IV.    Conclusion

For the foregoing reasons, the court will grant LINA's motion for summary judgment (Dkt. 43).  The court will also grant WMP's motion for summary judgment (Dkt. 47).  Wray's motion for judgment on the administrative record (Dkt. 45) will be denied.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 15th day of April, 2025.

_Jasmine H. Yoon_

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE